Filed 3/12/15  P. v. Bassett CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>TAMARA NICOLE BASSETT et al.,<br><br>    Defendants and Appellants. | C071072<br><br>(Super. Ct. No. 09F02925) |

The night of April 18, 2009, defendant Tamara Bassett went with Roshien Besa to see friends at Jeremy Sleeper's house in Elk Grove.  There, Bassett intervened in an argument between Besa and Besa's boyfriend, Brian McDaniel, and hit McDaniel.  In response, McDaniel hit Bassett in the face, bloodying her nose.  Angry, Bassett threatened to return with her Norteño gang member boyfriend, defendant Raymond Vigel, "to shoot up the place."  Bassett did return with Vigel, who fired multiple shots from the car.  The drive-by shooting left one person dead and three seriously injured.

1

Defendants were found guilty of first degree murder with a drive-by shooting special circumstance, three counts of attempted murder, and shooting at an inhabited dwelling. Various firearm, great bodily injury, and gang enhancements, and a gang special circumstance as to Vigel were also found true.[1] The trial court sentenced both defendants to life without the possibility of parole; in addition, the court sentenced Vigel to 160 years to life, and Bassett to 121 years to life.

On appeal defendants raise a myriad of issues, challenging the sufficiency of the evidence, the admission of certain evidence, the single jury, the jury instructions, misconduct by the prosecutor and two jurors, and certain fines and fees. We strike Bassett's parole revocation fine and order correction of Vigel's abstract of judgment. In all other respects, we shall affirm.

## FACTS

*Evidence at the First Trial*

*The Shooting*

On the evening of April 18, 2009, a group of longtime friends in their 20's, including Stephen Benetti, Michael Escarcega, and Justin Hughes, met at Jeremy Sleeper's house in Elk Grove, as they did most weekends. The friends were drinking and playing pool, and a NASCAR race was on the television. Also there that night was a neighbor, Rocky Arroyo, and his friend Brian McDaniel. No one in this group was affiliated with a gang.

McDaniel's girlfriend, Roshien Besa, arrived with her friend Tamara Bassett. Bassett did not know anyone at the gathering except Besa. Bassett talked with another

---

[1] There were two trials. Each trial used only one jury for both defendants. The first jury found Vigel guilty on some counts and failed to reach verdicts on others, including all counts charging Bassett. The second jury found both defendants guilty of all counts remaining before it.

woman about people they knew in Oak Park. Bassett mentioned her boyfriend was in a gang.

After drinking too much, Besa threw up in the bathroom. McDaniel was angry and they argued. Bassett got mad at McDaniel and told him not to call Besa a "bitch." McDaniel told Bassett to "shut up, bitch," and she hit McDaniel in the back of the head. McDaniel turned and hit Bassett in the face, hard enough to cause her nose to bleed.

McDaniel took Bassett's phone because she was threatening to call her boyfriend and tell him to "shoot up the place." Bassett told McDaniel, "[Y]ou hit me. . . . I'm gonna get my friends to kill you and shoot you." Bassett continued to yell for ten minutes that she was going to get her "Norte hom[ie]s" to shoot and kill everyone. McDaniel told Bassett just to go home and returned her phone; he told her they did not want problems. Bassett was still angry and Besa and others were trying to calm her down. Bassett got in her car and made a phone call. Besa got in the car and begged Bassett not to do anything or bring anyone to Sleeper's house. Bassett told Besa to get out of the car. Meanwhile, Bassett was on the phone saying that McDaniel had hit her and she "wanted something done about it"; she wanted McDaniel killed. When Bassett made a U-turn, Besa reached over and turned off the car. Bassett demanded that Besa get out, and she did so. Besa went back to Sleeper's and Bassett drove away.

Sleeper and Benetti asked Besa to call Bassett so there would not be any problems. Besa called and asked Bassett to come back and talk. Bassett asked if McDaniel was still there. Besa had not seen him but assumed he was still there, so she said yes. She asked Bassett to come by herself; Bassett said she was alone and that she had not picked up her boyfriend. Meanwhile, there were several calls between Bassett and her boyfriend Vigel.

Bassett then called Besa and said she was outside the house. Besa and Benetti went out to the car, which was in the street in front of the garage. Besa panicked when she saw Vigel in the front passenger seat, which was facing the house. Besa and Benetti talked to Bassett and Vigel, telling them they did not want any problems and that

3

McDaniel was not there. The garage door opened revealing several people inside, and Vigel asked if anyone was McDaniel; Bassett said no. Benetti leaned in the passenger window to talk. Vigel shouted, "Oak Park 10th Ave." and fired a gun at Benetti, who had stepped backwards. Benetti was shot in the stomach, and Vigel shot him three more times as he staggered toward some grass and fell. Vigel continued to fire into the garage. When the shooting ended, Bassett and Vigel "sped off."

*The Victims and Their Injuries*

The police arrived and found four victims. Benetti was on the lawn. He had been shot four times and spent 19 days in the hospital. He suffered injuries to his small bowel, colon, and bladder. The artery in his arm was injured and he suffered vein and nerve damage. His hip and hand were fractured.

There were more victims in the garage. Alison Freeseha had arrived at Sleeper's shortly before the shooting began. She had four gunshot wounds located in the back of her head, her back, her buttocks, and her lower left leg. The shots were fatal and she was pronounced dead at the scene.

Justin Hughes was in the garage when the shooting began and tried unsuccessfully to get back in the house. A bullet completely transected his spinal cord, leaving him permanently paralyzed. He suffered complications from his injuries, requiring multiple hospitalizations.

Michael Escarcega dove under the pool table when the shots were fired and called 911. He was shot in the leg and spent a month in the hospital. The gunshot caused injury to a blood vessel, requiring six or more surgeries to his left leg.

*Gang Evidence*

Detective Robert Strange testified as a gang expert, although he admitted he had had limited contact with Oak Park Norteños. He opined that Bassett participated in a criminal street gang based on her involvement with this case. He testified that Vigel was

4

a validated gang member and further opined that Vigel committed the crimes to benefit and promote the Norteño criminal street gang.

*The Defense*

Vigel testified in his defense. He admitted he "hung out" with Norteños, but denied that he had been "jumped in" the gang or committed crimes with the gang. He testified he was a heavy drinker and usually drank until he blacked out or got belligerent. The day of the shooting, he had also snorted cocaine.

When Bassett called him and told him she had been hit, he grabbed his gun. When he saw that her face and hands were full of blood and she was crying, he got mad and told her to take him to where she had been hit. He had no plan, but intended to "humiliate" McDaniel, probably to fight him. He claimed Bassett did not know that he owned a gun and they had no conversation about the gun.

Vigel testified he thought Benetti was going to hit him, so he pulled out the gun and fired. It was a "messed up" decision. Vigel claimed he did not aim and was not trying to kill anyone. After the shooting, both he and Bassett cried. He testified the shooting was wrong and he should not have done it.

Bassett's mother and stepfather testified to Bassett's good character.

A clinical and forensic pathologist testified about how factors such as the consumption of alcohol, stress, and a traumatic event, affect memory and recall.

*Verdicts*

The jury found Vigel guilty of first degree murder (Pen. Code, § 187),[2] and found various firearm enhancements (§ 12022.53, subds. (b)-(d)) and a drive-by shooting special circumstance true (§ 190.2, subd. (a)(21)). The jury also found Vigel guilty of the attempted deliberate and premeditated murder of Benetti, with the same firearm

---

[2] Further undesignated statutory references are to the Penal Code.

enhancements and a great bodily injury enhancement (§ 12022.7, subd. (a)), and shooting at an inhabited dwelling (§ 246).

The jury could not reach a verdict as to Vigel on the gang enhancements or the gang special circumstance, or counts three and four, the attempted murder of Hughes and Escarcega. The jury was "hopelessly deadlocked" on all counts as to Bassett. The trial court declared a mistrial as to these counts and allegations. The People elected to set the matter for retrial.

*Evidence at the Second Trial*

The evidence at the second trial was substantially similar to that at the first, although there was additional testimony about Bassett's threats and gangs, and additional witnesses. Hughes was unavailable due to medical problems, so his prior testimony was read to the jury. Vigel elected not to testify. Bassett introduced his prior testimony. Officer Mitchell Marquez and lead investigator Detective Brandon Gomez testified about their interview with Besa at the scene. She was afraid for her and her child's safety and did not want to testify. Besa had said when she saw Bassett and Vigel, she knew Vigel would kill someone because "they" always talked about how Vigel was in a gang and gang members do not care who they kill. Although Besa had not heard Vigel talk about people he had killed, he always wore red and said, "I'm gonna clap this guy." To "clap" means to shoot.

Escarcega testified he heard Vigel shout "14th Avenue" before he fired. He admitted that he had not testified to that in the "first proceeding." To corroborate Escarcega's testimony about Bassett's threats to get her "Norte homies" to kill them, the People introduced the testimony of two police officers. These officers testified Escarcega had told them about these threats.

Others who were at Sleeper's house that night testified as well. Robert Arroyo, a neighbor, testified Bassett talked about Oak Park and 14th or 44th Avenue. He told her there was no gang-banging going on at Sleeper's. After McDaniel hit her, Bassett was

6

mad and said she would come back with her boyfriend and shoot everyone. Sleeper testified, confirming the basic outline of what happened that night. McDaniel testified he heard Bassett talk about gangs that night. Strangely, he testified he did not believe he had hit Bassett, but conceded that obviously he had.

*Gang Evidence*

Detective Don Schumacher testified as an expert on "criminal street gang[s] in general, specifically Hispanic." He had been the lead detective in over 100 Norteño gang-related crimes. He testified to his opinion that Vigel was a Norteño gang member. He based this opinion on a number of factors. Twice, Vigel had admitted being a member of the Oak Park Norteños. There were photographs in which Vigel flashed Norteño gang signs. Vigel had been in repeated contact with other Norteño gang members and had been involved in gang-related crimes. Schumacher further opined that Vigel was actively participating with the Norteño gang when he committed these crimes. He opined that Bassett was not a gang member, but she acted in association with the gang. The basis of this opinion was her making threats concerning Vigel to the others and her knowledge of his gang membership. Based on a hypothetical that tracked the facts of this case, Schumacher opined that Bassett acted in association with the gang and Vigel acted to benefit the gang.

*Verdicts and Sentencing*

The jury found defendants guilty of all remaining charges. As to Vigel, the jury found true the gang special circumstance relating to Freeseha's murder. (§ 190.2, subd. (a)(22).) The jury also found true gang enhancements as to all counts. (§ 186.22, subd. (b)(1).) It found Vigel guilty of the attempted deliberate and premeditated murder of both Hughes and Escarcega (§§ 664/187), with firearm (§ 12022.53, subds. (b)-(d)) and great bodily injury (§ 12022.7, subds. (a)-(b)) enhancements.

The jury found Bassett guilty of first degree murder of Freeseha (§ 187), with firearm and gang enhancements (§§ 12022, subd. (a)(1), 186.22, (b)(1), 12022.53, subd.

7

(e)(1)) and a drive-by special circumstance (§ 190.2, subd. (a)(21)); the attempted deliberate and premeditated murder of Benetti, Hughes, and Escarcega, with the same enhancements; and discharging a firearm at an inhabited dwelling (§ 246), with the gang and gang-related firearm enhancements (§§ 186.22, subd. (b)(1), 12022.53, subd. (e)(1)).

The court sentenced Vigel to life in prison without the possibility of parole plus 160 years to life. The court sentenced Bassett to life in prison without the possibility of parole plus 121 years to life.

## DISCUSSION

### I

*Insufficient Evidence of First Degree Murder and Attempted Murder*

Vigel contends there is insufficient evidence to support his convictions for first degree murder and attempted murder. He contends the evidence "establishes" that he acted in the heat of passion and therefore he is guilty only of manslaughter and attempted manslaughter. Bassett joins this contention, arguing that because the evidence supports only a finding that Vigel acted in the heat of passion, she must be acquitted. The People assert there was substantial evidence that both defendants acted with premeditation and deliberation. We agree.

A. *The Law*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

"We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning

8

activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.] If the evidence of preexisting motive and planning activity by itself is sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 645-646.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner. [Citations.]" (*People v. Romero* (2008) 44 Cal.4th 386, 401 (*Romero*).)

B. *Analysis*

Here, the evidence of preexisting motive was very strong. After McDaniel struck Bassett, she vowed to get revenge. She threatened "to get my Norteno homies and come kill you." She said she would return with her boyfriend and shoot everyone. The evidence indicated Vigel shared this motive as Bassett called and said she wanted "something done about it"; she wanted McDaniel killed. Vigel testified Bassett called him, hysterical, and said she had been hit. Vigel then heard a male voice and the line went dead. Vigel was angry and immediately left to find Bassett.

There was ample evidence from which the jury could infer planning. There were several calls between Vigel and Bassett, beginning just before midnight and continuing until about half past midnight; one call lasted six minutes. These calls gave Bassett and Vigel the opportunity to plan for revenge. Vigel armed himself with a gun after the first call from Bassett. A jury can infer planning when the defendant brings a gun to the crime scene. (See *Romero, supra,* 44 Cal.4th at p. 401.) In the phone calls between Bassett and Besa, Bassett asked Besa if McDaniel was still there (to which Besa replied he was) and told Besa that she was coming back alone, suggesting a plan for revenge that required surprise at Vigel's participation. Bassett kept the car running while Vigel repeatedly fired, and drove away when he stopped shooting. This evidence suggests she knew that

9

Vigel was going to shoot at people, acquiesced in and facilitated the carnage while it was ongoing, and planned to (and did) leave quickly thereafter in order to escape responsibility.

Substantial evidence supports the verdicts for first degree murder and attempted deliberate and premeditated murder for both defendants.

II

*Insufficient Evidence of Gang Enhancements and Special Circumstance*

Both Vigel and Bassett contend there was insufficient evidence to support the gang enhancements, and in Vigel's case the gang special circumstance also. They make different arguments. Although both Benetti and Hughes testified that Vigel said "Oak Park, 10th Avenue" before the shooting, Vigel contends this evidence is insufficient to show the crime was gang related because others nearby, especially Besa and Sleeper, did not hear these words, and Hughes did not report these words to the police. Bassett contends the evidence, particularly Schumacher's vague testimony, was insufficient to establish either the primary activities or the predicate offenses of Vigel's gang.

A. *The Law*

Section 186.22, subdivision (b)(1) provides for a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." A "criminal street gang" "means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of" enumerated criminal acts, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A "pattern of gang activity" may be shown by the commission of two or more of certain offenses, committed within

10

certain time frames "on separate occasions, or by two or more persons."  (§ 186.22, subd. (e).)  This law is set forth in the pattern jury instruction CALCRIM No. 1401.

A gang special circumstance requires that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  (§ 190.2, subd. (a)(22).)

The standard of review of the sufficiency of the evidence of gang special circumstances and gang enhancements is the same as for any other conviction.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) The evidence must be "reasonable, credible, and of solid value."  (*Bolin, supra,* 18 Cal.4th at p. 331.)

B.  *Vigel's Contention*

Vigel contends there was insufficient evidence that his crimes were gang related rather than personal.  He argues the evidence showed he acted because Bassett was injured.  He recognizes there was evidence that before he fired, he yelled out his gang subset, "Oak Park, 10th Avenue," but argues this evidence was not substantial.

Detective Schumacher testified that gang members will announce their gang affiliation to show their gang is responsible for the crimes and to enhance the gang's reputation.  From this evidence, the jury could infer the crimes were committed to benefit the gang.  (See, e.g., *People v. Miranda* (2011) 192 Cal.App.4th 398, 412 [expert explained that "[w]hen a gang member announces his gang affiliation during commission of a crime, the entire gang is benefited by an enhanced reputation"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1162 [defense expert testified that "[w]hen a group commits a gang crime, it is customary for them to yell out their gang's name"].)

Vigel argues Benetti's testimony that he heard Vigel shout those words just before he fired is not substantial evidence because the others present, especially Besa who was standing right next to Benetti, did not testify they heard the same.  Hughes also testified

11

he heard "10th Ave." when the shots were fired and this testimony was read at the second trial where the jury found the gang allegations true. Vigel discounts Hughes's testimony because shortly before trial Hughes did not tell an investigator that he heard Vigel yell the gang affiliation.

These alleged "defects" in the evidence were explored on cross-examination, but the jury accepted the testimony that showed the shooting was identified as a gang crime, intended to benefit the gang and enhance its reputation. It is the exclusive province of the jury to resolve conflicting evidence and decide credibility issues. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient . . . ." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Vigel further contends that there was insufficient evidence he acted "in association with" a criminal street gang. Under section 186.22, subdivision (b), the gang enhancement is established by proof defendant acted "for the benefit of, at the direction of, *or* in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Italics added.) Having established that Vigel acted "for the benefit of" the Oak Park Norteños, the People were not required to also prove that he acted "in association with" the gang.

C. *Bassett's Contention*

Bassett contends there is insufficient evidence to establish either the primary activity or predicate offenses of Vigel's gang. She argues Schumacher's testimony on these points is too vague.

12

### 1. Primary Activity of Gang

Bassett contends Schumacher did not establish any primary activity of the gang. Instead, she contends, he testified only to his investigations.

The People asked Schumacher what, in his opinion, is the primary activity of the Norteño criminal street gang. He responded, "[A]s far as the larger Norteno gang is concerned, I've investigated . . . crimes ranging from graffiti to felony assaults with deadly weapons to felony batteries, possession of illegal firearms, assaults with firearms, drive-by shootings, car-jackings, . . . even several murders."

In claiming this testimony is insufficient to establish the gang's primary activities, Bassett relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*) and *In re Nathaniel C.* (1991) 228 Cal.App.3d 990 (*Nathaniel C.*). In *Alexander L.*, when asked about the primary activities of the gang, the expert responded, " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Alexander L.,* at p. 611.) The court found this testimony insufficient because even if the court inferred the expert meant the primary activities were those crimes to which he referred, the testimony lacked an adequate foundation. Nothing in the expert's testimony established its reliability; he did not testify as to how he "knew" of the crimes. (*Id.* at pp. 611-612.) The testimony was conclusory. (*Id.* at p. 612.) Likewise, the gang expert in *Nathaniel C.* offered only "vague, secondhand testimony" about what he had been told by the police in another area to establish one of the predicate crimes; he had no personal knowledge. (*Nathaniel C.*, at p. 1003.) Here, by contrast, Schumacher testified at length about his experience with Norteño gangs. The crimes he listed were those he had personally investigated.

We reject the argument that Schumacher's testimony did not establish the crimes he listed were *primary activities* of the gang. In *People v. Margarejo* (2008) 162 Cal.App.4th 102, the gang expert was asked the primary activities of a gang and

13

responded by describing the gang's activities. Defendant contended this evidence was insufficient because the expert left out the word "primary" in his answer. The court rejected this contention, reasoning that while counsel's questions are not evidence, their wording is relevant in interpreting the answer and sometimes is vital, such as when the answer is simply "yes." (*Id.* at p. 107.) "Here the jury had ample reason to infer that [the expert's] answer implicitly incorporated the word 'primary' from the question." (*Ibid.*)

Unlike the expert in *Alexander L.*, Schumacher provided sufficient background information about his training and the sources of his information concerning the Norteño criminal street gang to support the reliability of his opinions and conclusions. That he did not repeat the term "primary activities" in response to the People's question does not provide a reasonable basis to interpret his response as meaning anything other than that the crimes he listed, which he had personally investigated, were the principal activities of the gang.

### 2. Predicate Offenses

Schumacher testified about three predicate offenses, crimes committed by a Mr. Torrez and a Mr. Bruno (both Oak Park Norteños), to establish the gang's pattern of criminal activity. In June 2007, Torrez picked up a trash can lid, yelled out "Oak Park" and threw the lid through the window of a vehicle striking a rival gang member in the face. A few months later, Torrez's cousin beat up someone believed to be a "snitch" and then, while the perceived snitch was on the ground, Torrez came out of the crowd and shot him multiple times in the stomach. Torrez sustained a conviction for "these crimes" that included a gang enhancement. In August 2007, Bruno crashed a birthday party and asked a partygoer his gang affiliation. The individual responded that he was not in a gang and went to his vehicle to leave. Bruno fired multiple rounds into the victim's vehicle as it left the parking lot. Bruno was convicted of "this crime," including a gang enhancement.

Bassett does not dispute that these crimes *may* qualify as predicate offenses under section 186.22, subdivision (e).  Instead, she objects on the basis that Schumacher did not *identify* the crimes that Torrez and Bruno committed.  She contends the People "submitted no documentary evidence to establish the crimes of conviction and the jury was not instructed on the elements of the crimes that supported the predicate offenses."[3]

While Schumacher did testify that both Torrez and Bruno were convicted of their offenses, with a gang enhancement, he was not asked to *identify* the crimes of conviction, and the People simply referred to the various offenses to which he was testifying as "these crimes" or "this crime."  So the offenses committed by Torrez and Bruno were never identified--either for the jury, or otherwise.  Under section 186.22, subdivision (e), a pattern of criminal activity may be shown by evidence of the commission or attempted commission of two or more predicate crimes--proof of conviction is not required.  The first enumerated crime in that subdivision is assault with a deadly weapon or by means of force likely to produce great bodily injury.  (§ 186.22, subd. (e)(1).)  This offense seems to encompass the criminal conduct of both Torrez and Bruno as described by Schumacher.  Thus, in order to determine whether substantial evidence supports the jury's finding of the requisite predicate offenses, we would need to determine whether a

---

[3]  At oral argument, without sufficient advance notice to the court, Bassett sought to rely on *People v. Garcia* (2014) 224 Cal.App.4th 519, in which a gang enhancement was reversed for insufficient evidence of the required predicate offenses.  In *Garcia*, the People failed to prove the predicate offenses because the proffered evidence did not show the offenses were within three years of each other as required by section 186.22, subdivision (e).  (*Garcia,* at p. 525.)  The court also rejected the People's argument that defendant's conduct could be used to show the commission of a predicate offense, even though he had been acquitted.  While the statute permits establishing a predicate offense by either "commission" or "conviction," the *Garcia* jury had been instructed-- erroneously--that a conviction was necessary to establish a predicate offense.  (*Ibid*.)  *Garcia* does not aid Bassett because the defects in the evidence there are not present in this case.  Here, there is no issue as to the three-year limitation, and our analysis follows the instructions as given to the jury.

15

jury could find, without instruction on the elements, that the actions of Torrez and Bruno--which resulted in convictions for unspecified crimes--constituted the predicate crime of assault with a deadly weapon or by means of force likely to produce great bodily injury.[4] However, as we explain *post,* because here the jury was not instructed that assault of any kind even *qualified* as a predicate offense for purposes of finding a pattern of criminal gang activity, we cannot make that determination. We cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule. (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.)

The trial court instructed the jury that one of the requirements of a criminal street gang was that its members "engage in a pattern of criminal activity." It defined that pattern as, "[T]he commission of or attempted commission of or a conspiracy to commit, or solicitation to commit, or conviction of attempted murder in violation of Penal Code section 664/187(a) or murder in violation of Penal Code section 187." Under this instruction, given in both trials, the predicate offenses were limited to murder and attempted murder.

CALCRIM No. 1401 requires that the applicable crimes from section 186.22, subdivision (e) (of which there are 33) be inserted into the instruction. Here, apparently by mistake, only the *charged* offenses were inserted instead of all the *predicate* offenses for which there was evidence. As the People argued in closing, the purpose of Schumacher's testimony about the crimes of Torrez and Bruno was to prove the pattern of criminal gang activity.

---

[4] We observe that the bench notes to CALCRIM No. 1401 direct: "The court should also give the appropriate instructions defining the elements of crimes inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions."

16

We requested supplemental briefing addressing the adequacy of CALCRIM No. 1401 as given, and the effect of any inadequacy on this case.

Defendants respond the instructions given were inadequate to permit the jury to find the gang enhancements or the gang special circumstance true. The jury received no instruction on aggravated assault (with a firearm or with force likely to produce great bodily injury), either as to its elements or that such crime could serve as a predicate offense. While the jury *was* instructed on the elements of murder and attempted murder, those instructions specified they related to the *charged* offenses. More importantly, defendants contend Schumacher's testimony about the facts of the predicate offenses was too cursory to provide sufficient evidence that either Torrez or Bruno committed murder or attempted murder.

Surprisingly, the People's supplemental brief does not recognize any mistake in the instruction. The People argue the trial court did not need to instruct on the elements of the predicate offenses because Schumacher testified both Bruno and Torrez were convicted of their crimes, although the People's briefing, like the prosecutor at trial, fails to identify what those crimes were. Further, the People point out that the jury was instructed on the elements of murder and attempted murder, the crimes listed as predicate offenses to be used to determine a pattern of criminal activity. Conspicuously absent from the People's brief is any discussion of Schumacher's *actual testimony* about the predicate offenses, including that he was not asked to identify the crimes for which Bruno and Torrez were convicted. Nor is there any argument that Schumacher's general description of Bruno and Torrez's assaultive conduct (which included throwing a trash can lid and two shootings) was sufficient to show they committed either of the only two potential predicates (murder and attempted murder) actually set forth in the jury instruction. Instead, the People assert any error is necessarily harmless because defendants never challenged that the Norteños constitute a criminal street gang. This argument ignores the fundamental duty of the prosecution to prove every element of the

17

crimes and enhancements charged beyond a reasonable doubt. (See *People v. Belton* (1979) 23 Cal.3d 516, 520.) Defendants "at the outset mounted the most complete challenge possible" to the gang enhancements and special circumstance; they demanded a trial. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262.) "[D]efendant[s] could not waive [their] right to challenge the sufficiency of the evidence on which the allegation was found true until it was found true and, then, only by failing to file a timely notice of appeal. In this, however, [they] did not fail." (*Ibid*.)

The charged offenses may also be used to establish a gang's pattern of criminal activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 10-11.) The trial court told the jury: "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether it's -- a pattern of criminal gang activity has been proved."

The People concede the current offenses can constitute only one predicate offense. The predicate offenses must be committed on separate occasions or by two or more people. (§ 186.22, subd. (e).) Here, all the current offenses were committed on one occasion and only Vigel was a direct perpetrator. Bassett's act of aiding and abetting does not constitute a separate predicate offense. (*People v. Zermeno* (1999) 21 Cal.4th 927, 931-932.)

The questions we are left with, then, is whether Schumacher's testimony about the predicate offenses was sufficient to establish a second predicate offense of murder or attempted murder, and, correspondingly, whether the jury instructions as given supplied the jury with sufficient information to so find.

Schumacher did not testify that any of the victims of the crimes perpetrated by Bruno or Torrez died, so there is no evidence to support a predicate offense of murder. There is, however, sufficient evidence from which the jury could find attempted murder. Schumacher testified Torrez's cousin beat someone believed to be a snitch. Torrez then stepped from the crowd and shot this victim multiple times in the stomach while the

18

victim was on the ground. From this description of the crime, the jury could infer Torrez was at close range and by firing multiple times intended to kill his victim. "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*People v. Smith* (2005) 37 Cal.4th 733, 742 (*Smith*); also *People v. Silva* (2001) 25 Cal.4th 345, 369 ["multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant--is entirely consistent with a premeditated and deliberate murder"]; *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [firing a single gunshot "toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill"].)

Defendants contend the jury was not instructed on the elements of attempted murder as it related to the predicate offenses. They are correct that the instruction on predicate offenses did not include the elements of attempted murder. While the jury *was* instructed on the elements of attempted murder as one of the current offenses, defendants stress the instruction stated it applied to the charged counts of attempted murder and included the names of the victims of those charges. Although this is also correct, we find no prejudicial error in failing to instruct on the elements of attempted murder as it relates to the predicate offenses. We consider the correctness of jury instructions based on the entire charge to the jury and the absence of an essential element in one instruction may be cured when it is supplied by another instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Here, considering the jury instructions as a whole, the jury was adequately instructed on the elements of attempted murder. Schumacher's testimony provided sufficient evidence from which the jury could find Torrez committed that crime, thus establishing the second predicate offense for a pattern of criminal activity. Sufficient evidence supports the gang enhancements and the gang special circumstance.

19

## III

### *Gang Expert's Reliance on Hearsay*

Vigel contends the trial court erred in permitting Schumacher to opine that Vigel was a gang member based on unreliable hearsay. He contends the hearsay statement was unreliable because it referred to a declaration of gang membership that could not be definitively attributed to him.

A. *Background*

In the second trial, Vigel moved to exclude evidence of a statement made by Regina Murrti about a birthday party in late July 2007. At that party, Murrti heard Vigel or his brother Sam say "I am here representing Oak Park." Schumacher intended to rely on this statement as part of the basis of his opinion that Vigel was a member of the Norteño street gang.

The trial court found neither the Fifth nor Sixth Amendment was implicated by admission of this statement; it was the type of hearsay on which an expert could rely. On cross-examination, the defense could point out the statement was not necessarily attributed to Vigel.

Schumacher testified that in his opinion Vigel was a member of the Norteño criminal street gang. He based his opinion in part on Vigel's repeated contact with validated or admitted gang members, and discussed two such incidents. The second incident occurred in 2007 at a family birthday party in West Sacramento that Vigel attended with his brother. One of the partygoers overheard Vigel or his brother tell someone they were there representing Oak Park. Vigel became intoxicated and started a fight, so he was asked to leave. Vigel and his brother left, but they returned with three others, two of whom were identified Norteño gang members. This group assaulted the head of the household, and then led the police on a high-speed pursuit. The group's vehicle was found abandoned in Oak Park. No charges were filed in connection with this incident.

20

B. *The Law*

"Expert testimony in the form of an opinion may be based on hearsay or facts outside the personal knowledge of the expert." (*People v. Harris* (2013) 57 Cal.4th 804, 847; Evid. Code, § 801, subd. (b).) However, "an expert may not under the guise of stating reasons for an opinion bring before the jury incompetent hearsay evidence." (*People v. Price* (1991) 1 Cal.4th 324, 416.)

"Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (*People v. Montiel* (1993) 5 Cal.4th 877, 919).) A trial court may cure a hearsay problem by a limiting instruction, or by excluding the evidence as irrelevant, unreliable, or potentially prejudicial under Evidence Code section 352. (*Montiel,* at p. 919.)

C. *Analysis*

Schumacher relied on several factors in concluding Vigel was a gang member, including Vigel's prior admissions, pictures of him throwing gang signs, his contact with gang members, and his commission of gang-related offenses. "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 949.) Vigel did not object to this other evidence, which is sufficient alone to support Schumacher's opinion. Further, the evidence about the birthday party was admitted to show Vigel had contact with gang members, one factor in determining that he was a gang member. Even assuming it was his brother, not him, who claimed to represent Oak Park, the claim demonstrated Vigel's close contact with gang members. In any event, the affiliation was clearly shown because Vigel returned to the party with two *other* gang members and assaulted someone.

The trial court did give a limiting instruction just before this portion of Schumacher's testimony, at Bassett's request. The instruction told the jury evidence of gang activity could be used only to prove gang-related crimes and enhancements and not as evidence of bad character or disposition to commit crimes. "In the absence of evidence to the contrary, we assume the jury followed this instruction. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 321.)

There was no reason to exclude the evidence as unduly prejudicial under Evidence Code section 352. " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) In light of all the other (overwhelming) evidence showing Vigel's gang membership--the rest of Schumacher's testimony, including that Vigel had admitted twice that he was a gang member, Besa's statements to officers about her concern due to Vigel's gang membership, and evidence that Vigel shouted his gang affiliation before shooting--it is inconceivable that evidence of what Murrti reported was said at the party inflamed the jury against Vigel.

IV

*Gang Expert Testimony that Bassett Acted in Association with Gang*

Bassett contends the trial court erred in admitting, over her objection, Schumacher's testimony that although Bassett was not an active gang member, her actions the night of the shooting were done in association with the Norteño street gang. She contends the jury was as competent as the expert to determine what Bassett knew and whether her conduct was in association with a gang.

A. *Background*

Schumacher first testified Bassett was not an active member of the Norteños. Over Bassett's objection of improper opinion, Schumacher then testified her actions surrounding the shooting were done in association with the Norteño street gang. The bases of his opinion were her various statements about her boyfriend being a Norteño and that he would retaliate or "fuck you up." In Schumacher's opinion, these statements showed Bassett "had a fairly intimate knowledge that her boyfriend was an active Norteno gang member."

Bassett moved for a mistrial, contending Schumacher had improperly testified to Bassett's state of mind. The court denied the motion.

The prosecutor then asked Schumacher a hypothetical question that closely tracked the evidence in this case and asked, "In your expert opinion, did the girlfriend commit the act in association with the criminal street gang Nortenos?" Schumacher said yes. His opinion was based on the girlfriend's statements at the party about her boyfriend being a Norteño. Further, Schumacher opined that the acts of picking up the boyfriend, driving him to the party, being present while he fired shots and shouted his gang set, and then driving him away were all "done in association with a Norteno gang member who is part of a larger Norteno gang set."

B. *The Law*

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id.*, subd. (a).) The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617; see also *id.* at p. 619 [expert opinion that described attack would be "gang-

related activity"].)  The prosecution may use hypothetical questions that track the evidence, even if only "thinly disguised," to establish that the crime was gang related. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.)

"[A]lthough expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant.  [Citations.]  In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.'  [Citations.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)

"When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.)  "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.  [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426)

C. *Analysis*

We find no abuse of discretion in admitting Schumacher's opinion that Bassett acted in association with the gang.  Numerous cases have found the purpose and intent elements of a gang enhancement are usually beyond common knowledge and thus properly are the subject of expert testimony. (E.g., *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512–1513; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1207-1209; *People v. Valdez* (1997) 58 Cal.App.4th 494, 507-509.)  "Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony.  [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)  Schumacher testified to this sociology and psychology.  In his experience, girlfriends of gang members were proud to be with a gang member.  They liked the transferred respect and notoriety that came from

being connected to a gang member. Bassett used her association with Vigel--and, through him, used her association with his gang--to instill fear into the other partygoers the night of the shooting. Ultimately, due to Bassett's actions in making sure Vigel arrived at the party to help her exact her revenge, that fear proved justified.

V

*Separate Juries*

Vigel contends the trial court erred in denying his motion for a separate jury in the first trial.[5] He contends he needed a separate jury to prevent Bassett's statements from prejudicing him. He argues that while her statements were admitted only against her, to show her state of mind, and a limiting instruction was given, it was impossible for the jury to refrain from considering these statements for the truth of the matter asserted--that her boyfriend was a gang member and she would get him to shoot everyone--against him, particularly since the People used these statements for just that purpose in closing argument. He contends the error was prejudicial because without Bassett's statements, the jury could have found him guilty of manslaughter on a heat of passion theory.

A. *Background*

Before the first trial, Vigel moved for separate jury, contending that he would be unable to confront Bassett about her statements. The trial court denied the motion. In a lengthy and detailed ruling, the trial court found: Bassett's statements were not testimonial under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*); the statements were admissible under Evidence Code section 1250, the state of mind exception to the hearsay rule, which was a firmly rooted hearsay exception (*People v. Morales* (1989) 48 Cal.3d 527, 552, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459); the statements, made in a casual setting, were

---

[5] In the second trial, Vigel advocated for a single jury.

25

trustworthy; and the court would give CALCRIM No. 305, a limiting instruction. The court also found the statements were against Bassett's penal interest, as she stated her intent to aid and abet a shooting. Finally, the court found the statements were admissible as hearsay upon which the gang expert could rely in forming his opinion relative to the gang enhancements.

The People elicited testimony from witnesses that Bassett said her boyfriend was a Norteño gang member, and that after she was struck by McDaniel, she threatened to have Vigel shoot everyone. The court repeatedly admonished the jury that these statements could be used only against Bassett.[6] The court instructed the jury, "You have heard evidence that each defendant made statements out of court and out of the presence of the other defendant. You may consider that evidence only against the defendant who made the statement."

In closing argument, the People argued that Bassett said exactly what she was going to do; it was her choice to get her "muscle" and her "loaded weapon," that is, Vigel. Besa tried to stop her because she knew Vigel was a Norteño and what he was capable of doing. The People stressed that Bassett made true on her threats. In rebuttal, the People again stressed that Bassett told people before the shooting what she was going to do. Neither defendant objected to these arguments.

B. *The Law*

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) Prior to *Crawford*, the test for

---

[6] We note that if the statements were properly admissible as statements against penal interest, they would be admissible against Vigel as well as Bassett. (*People v. Acero* (2011) 195 Cal.App.4th 556, 576-577; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 175-176.)

confrontation clause compliance focused on whether the statement, made out of court by an unavailable speaker, bore adequate indicia of reliability because it either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."[7] (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 608].)

In *Crawford,* the high court rejected the rule of *Roberts*; instead, it held that the right of confrontation applies only to out-of-court testimonial statements, and that such statements are admissible at trial only when the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. (*Crawford, supra,* 541 U.S. at pp. 68-69 [158 L.Ed.2d at p. 203].) Subsequently, the court articulated the corresponding rule that the confrontation clause does not apply to nontestimonial hearsay. (See *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [167 L.Ed.2d 1, 13]*; Davis v. Washington* (2006) 547 U.S. 813, 821-822 [165 L.Ed.2d 224, 236-237].) Testimonial statements "have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

---

[7] There was a special rule for out-of-court statements by a non-testifying codefendant. In *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476], the United States Supreme Court held that the introduction of a confession of a defendant that implicates a codefendant violates the codefendant's constitutional right of cross-examination even if the jury is instructed to disregard the confession in determining the codefendant's guilt or innocence. (*Id*. at p. 137 [20 L.Ed.2d at p. 485].) The court recognized that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," that "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Id*. at pp. 135-136 [20 L.Ed.2d at pp. 484-485].)

C. *Analysis*

Vigel concedes that Bassett's statements are not testimonial. Given that concession, there is no confrontation clause violation, which was the basis of Vigel's motion for separate juries. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 813.) Consequently, the only issue we need to decide is whether Bassett's statements are admissible under state evidentiary law.

Vigel focuses on the trial court's finding that the statements were admissible for the nonhearsay purpose of showing Bassett's state of mind. Evidence Code section 1250, subdivision (a)(1) allows the admission of a statement offered to prove the declarant's state of mind "at that time or at any other time when it is itself an issue in the action." Here Bassett's state of mind was at issue, specifically her intent because she was charged as an aider and abettor. This state of mind exception to the hearsay rule is inapplicable "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.) " ' "The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion." ' [Citation.] 'To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are " 'made at a time when there was no motive to deceive.' " [Citation.]' " (*People v. Ervine* (2009) 47 Cal.4th 745, 778-779.)

Vigel contends Bassett's statements are not trustworthy "where [he] is concerned." He argues he was not present, did not hear the statements, and "[t]hey could in no way be construed as [his] adoptive admissions." That is not the test for trustworthiness under Evidence Code section 1252; the test focuses only on the circumstances when the statements were made, not whether a defendant has adopted the content of the statement.

28

Vigel does not contend the circumstances were such as to make the statements untrustworthy.

The trial court found the statements were trustworthy, as they were made voluntarily in a social setting with no thought of any legal use. We review this finding for abuse of discretion. (*People v. Edwards* (1991) 54 Cal.3d 787, 820; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 386.) Vigel has failed to show the trial court abused its discretion in finding the statements were trustworthy, and thus has failed to demonstrate an abuse of discretion in admitting the statements under the state of mind hearsay exception.

Vigel's main contention appears to be that the People improperly used Bassett's statements for the truth of the matter she asserted, and against him, rather than simply against Bassett to show her state of mind. He bases this contention on the People's closing arguments, which stressed that Bassett's threats outlined exactly what she was going to do and that she and Vigel carried through on her threats. Vigel argues the People used Bassett's statements as evidence he was a gang member and that he would avenge Bassett. He contends the People's argument relied on Bassett's statements to establish *his* actions and *his* premeditation and deliberation.

By failing to object at trial, Vigel has forfeited any contention that such argument was improper. (*People v. McDowell, supra,* 54 Cal.4th at p. 436.) Vigel responds he should not be required to interrupt argument to renew his objection to the in limine ruling denying his motion for a separate jury. He argues the People's improper use of the evidence was foreseeable and could--and should--have been prevented by granting his motion for a separate jury. The proper objection during argument, however, was to the argument, not to earlier rulings. To the extent the People's argument was improper (a conclusion we do not reach), it was incumbent upon Vigel to object.

Further, any error in the People's closing argument was harmless. First, the trial court instructed the jury that the evidence of Bassett's statements was to be used only

29

against her and admonished the jury about this limited use when the evidence was received. We presume the jury understood and followed the instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Also, there was ample evidence to convict Vigel of premeditated and deliberate murder and attempted murder. Vigel returned with Bassett to the Sleeper residence after several phone calls between the two, giving him time to consider his actions. He took his gun, supporting the inference that he planned a violent encounter. (See *People v. Marks* (2003) 31 Cal.4th 197, 230.) After he was told McDaniel, presumably perceived by him as the offending party, was not there, he did not leave. Instead, he announced "Oak Park, 10th Avenue" and fired multiple times, killing one victim with four shots to her body and wounding three others with multiple shots. Vigel then fled.

VI

*Admission of Photographs*

Defendants contend the trial court erred in admitting into evidence 22 photographs showing the injuries to the four victims. There are photographs of Freeseha both at the scene and from the autopsy, showing the bullet holes in her back and head; and photographs of Benetti, Hughes, and Escargega in the hospital, showing their injuries and the various medical tubing and equipment used. Vigel contends the photographs were cumulative and prejudicial and that one photograph per victim would have been sufficient. Bassett joins the argument.

At the first trial, Bassett asked the court to exercise its discretion to limit photographic evidence; Vigel joined this motion. The trial court excluded one autopsy photograph showing bullet holes in Freeseha's back and buttocks, as cumulative. The court admitted the remaining photographs, finding them not unduly graphic and relevant to show the injuries and assist the jury in evaluating the testimony of witnesses, including the forensic pathologist. At the second trial, defendants again objected to admitting all the photographs. The trial court found the photographs relevant to show the spread of

30

gunfire and to support the great bodily injury enhancements. It found their probative value clearly outweighed their prejudicial effect. The court noted the photographs were not as graphic as those routinely shown on television shows such as CSI.

"The admission into evidence of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion. [Citation.]" (*People v. Rountree* (2013) 56 Cal.4th 823, 852.) A trial court has broad discretion to admit photographs "in the face of a claim that they are unduly gruesome or inflammatory. [Citation.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 938.) " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . .' " (*People v. Pierce* (1979) 24 Cal.3d 199, 211, quoting *People v. Long* (1974) 38 Cal.App.3d 680, 689.) "[A] court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner." (*People v. Coleman* (1988) 46 Cal.3d 749, 776.)

As did our Supreme Court in *People v. Ramirez* (2006) 39 Cal.4th 398 at page 454, we find the photographs at issue "are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes." Here, as each trial court found, the photographs were very probative, showing that Freeseha was shot multiple times in the back and the grave injuries the other three victims suffered. At both trials, the trial court carefully exercised its discretion before admitting the photographs, weighing the probative value against the possible prejudicial effect. We have reviewed the photographs and find they are not unduly shocking or gruesome. It was not an abuse of discretion to admit them.

VII

*Admission of Vigel's Prior Convictions*

Bassett contends the second trial court erred in permitting the People to use Vigel's convictions from the first trial to impeach his testimony given in the first trial

31

(and subsequently read to the jury in his second trial). Bassett introduced Vigel's testimony in the second trial and now contends the evidence of Vigel's convictions should have been excluded under Evidence Code section 352 because they were of minimal probative value as they did not involve dishonesty. Further, she contends that by sanitizing his convictions to characterize them as three prior felony convictions involving moral turpitude in the past five years, the evidence was confusing and prejudicial because the jury may have believed that Vigel had convictions in addition to those arising from this case.[8]

A. *Background*

In the second trial, Bassett moved to admit Vigel's testimony from the first trial if he exercised his right not to testify. The People argued that Vigel's felony convictions in the first trial could be used to impeach his prior testimony. Bassett objected, arguing that indicating to the jury that Vigel had been convicted in this case would lessen the prosecution's burden of proof as to Bassett. Later, the trial court ruled Vigel's priors could be used for impeachment, but that they would be sanitized so the jury would not know they were from this case. The People could introduce evidence that Vigel had been convicted of three felonies involving moral turpitude in the past five years. Defendants' objection to this ruling was preserved. At the People's request, and with no procedural objection from the defense, the trial court took judicial notice of Sacramento County court records showing that Vigel had been convicted of three felony convictions within the past five years and those convictions were for crimes of moral turpitude.

---

[8] Although Vigel joined in Bassett's contention on appeal, he did not make any separate arguments about how the alleged error in admitting his sanitized convictions from the first trial may have prejudiced the jury's consideration of the charges against him in the second trial. "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) We will not make his arguments for him.

B. *The Law*

Generally, "all relevant evidence is admissible." (Evid. Code, § 351.) A felony conviction involving moral turpitude may suggest a willingness to lie and thus is probative to impeach a witness. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296 (*Wheeler*); *People v. Castro* (1985) 38 Cal.3d 301, 314-315 (*Castro*).) Section 28, subdivision (f) of article I of the California Constitution provides: "Any prior felony conviction . . . shall . . . be used without limitation for purposes of impeachment . . . ." In *Castro, supra,* 38 Cal.3d 301, our Supreme Court held that trial courts retain their discretion under Evidence Code section 352 to bar impeachment with felony convictions that necessarily involve moral turpitude when their probative value is substantially outweighed by their prejudicial effect. (*People v. Collins* (1986) 42 Cal.3d 378, 381.)

A trial court may exclude evidence under Evidence Code section 352 if its probative value is substantially outweighed by a substantial danger of undue prejudice or confusion of issues. "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931.)

We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 449.)

C. *Analysis*

We find no abuse of discretion in the trial court's decision to admit Vigel's prior convictions for impeachment. Although the convictions occurred after Vigel testified, it is the criminal conduct, not the fact of conviction, that is relevant on the issue of credibility. (*Wheeler, supra,* 4 Cal.4th at p. 299.) The *Clark* factors support admitting the priors: the convictions were for crimes of moral turpitude and thus reflected on

33

Vigel's honesty or veracity; they were not remote; although they involved the same crimes before the jury, the jury was not apprised of that fact; and the record is devoid of evidence that admission of the priors had any effect on Vigel's willingness to testify or Bassett's use of that testimony. To exclude Vigel's priors would have given his prior testimony " ' "a false aura of veracity." ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 888.)

Bassett contends the jury already knew of Vigel's willingness to "do evil" because he admitted that he owned a gun, took it to the Sleeper residence, and fired multiple times, striking the victims. Therefore, she argues, admitting the priors was unnecessary. To the extent we accept this argument, it follows that admission of the priors did not prejudice Bassett. Bassett claims the jury was likely to reject Vigel's testimony that Bassett did not know of his gun if the jury believed (due to hearing of his criminal convictions) that he was "an evil person prone to criminal acts and likely to possess a gun and [Bassett] knew it." It is difficult to imagine how hearing that Vigel had committed past crimes could convince the jury that Vigel was evil or prone to violence to a greater extent than did the evidence of his current crimes, which, as Bassett points out, amply showed his willingness to "do evil."

VIII

*Instructional Error: Kill Zone Theory*

Bassett contends the trial court erred in the second trial by instructing on the "kill zone" theory. She contends there is no evidentiary support for this instruction, and therefore the convictions for the attempted murder of Hughes and Escarcega must be reversed. Vigel joins in this contention.

A. *The Instruction*

One of the theories the People relied upon to prove the attempted murder of Hughes and Escarcega was the kill zone theory. The trial court instructed the jury: "A

34

person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone.

"In order to convict defendant of the attempted murder of [Hughes] and [Escarcega], the People must prove that the defendant not only intended to kill [Benetti] but also either intended to kill [Hughes] and [Escarcega] or intended to kill everyone within the kill zone.

"If you have a reasonable doubt whether the defendant intended to kill [Hughes] and [Escarcega] or intended to kill [Benetti] by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of [Hughes] and [Escarcega]."

B. *The Law*

"[T]he trial court must instruct on the general principles of law applicable to the case," which means the court "must give instructions on every theory of the case supported by substantial evidence . . . ." (*Young, supra,* 34 Cal.4th at p. 1200.) "Evidence is 'substantial' only if a reasonable jury could find it persuasive. [Citation.]" (*Ibid.*) In determining whether an instruction should be given, the court does not weigh the credibility of the evidence. (*Ibid.*) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

We apply the de novo standard of review to claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Where intent to kill is at issue in murder, it may be proven through the doctrine of transferred intent. " 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished

what he set out to do.'  [Citation.]"  (*People v. Bland* (2002) 28 Cal.4th 313, 320-321 (*Bland*).)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7.)  The doctrine of transferred intent, however, does not apply to inchoate crimes such as attempted murder.  (*Bland, supra,* 28 Cal.4th at pp. 317, 327.)  "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them."  (*Id*. at p. 329.)  A person who shoots at a group of people, primarily targeting only one of them, may be found guilty of attempting to murder everyone in the group, if the person also, concurrently, intended to kill others within the " 'kill zone.' "  (*Id*. at pp. 329-330.)

"[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim.  Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]"  (*Smith, supra,* 37 Cal.4th at pp. 745-746.)

C.  *Analysis*

Bassett contends that Hughes and Escarcega were not in Benetti's kill zone or immediate vicinity.  She argues that Vigel changed the direction in which he fired after shooting Benetti.  We find that there is evidence from which the jury could conclude that Hughes and Escarcega were in Benetti's kill zone.

Benetti testified he had stepped back towards the rear of the car before Vigel fired and Vigel had to aim the gun backwards to shoot him.  If Vigel had fired straight ahead, Benetti testified, he would have fired into the garage.  Thus, at the first shot, Benetti was

36

not in the same line of fire as those in the garage.  Benetti, however, did not stay in the same place once he was shot.  He moved toward the front of the car and lay down in some grass next to the driveway.  Benetti continued to hear gunfire.  He was shot three more times between the first shot when he was at the rear of the car and when he was on the grass.  Once he was at the grass, the gunfire continued.  When it stopped, the car left.

From this evidence, the jury could conclude that Vigel intended to kill Benetti by firing a gun at him at close range.  (*Smith, supra,* 37 Cal.4th at p. 741.)  The jury could further conclude that Vigel continued to fire at Benetti as Benetti passed by the passenger window (perhaps then striking Benetti's left arm), at which point the garage was behind Benetti.  It was this gunfire, that continued as Benetti staggered to the grass, that struck Hughes and Escarcega.  This evidence is sufficient to show that Hughes and Escarcega were in the kill zone around Benetti and supports giving the kill zone instruction.

IX

*Instructional Error:  Natural and Probable Consequence of Conspiracy*

Bassett contends the second trial court erred by instructing the jury that it could find the shootings were the natural and probable consequence of an uncharged conspiracy between Bassett and Vigel to assault McDaniel.  She contends the evidence did not support this theory because any conspiracy ended before Vigel began shooting when Vigel was told that McDaniel was not present.  Vigel joins this contention.

A.  *The Instruction*

In addition to arguing that Bassett was an aider and abettor, the People argued she could also be guilty "under the legal principals of uncharged conspiracy and a natural and probable consequence doctrine."  The People argued the jury could find a conspiracy to assault McDaniel and that the shooting was a natural and probable consequence of that conspiracy.

The trial court instructed the jury that the People had presented evidence of a conspiracy to commit an assault on McDaniel.  The court instructed on the law of

37

conspiracy, including as relevant here the following: "A member of a conspiracy is also criminally responsible for any act of the member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. [¶] This rule applies even if the act was not intended as part of the original plan. [¶] A natural and probable consequence is one that a reasonable person would know if likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

B. *Analysis*

Bassett does not argue that there was insufficient evidence either of a conspiracy or that the shooting was a natural and probable consequence of that conspiracy. Instead, her contention is that any conspiracy had ended before the shooting began (although she did not request any instruction defining the "end" of a conspiracy). The general rule is that a conspiracy comes to an end when the target crime of the conspiracy " 'is either attained or defeated.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 143.) Bassett contends the conspiracy to assault McDaniel was "defeated" because he was not present at Sleeper's when Vigel and Bassett arrived. We are not persuaded.

"It is for the trier of fact -- considering the unique circumstances and the nature and purpose of the conspiracy of each case -- to determine precisely when the conspiracy has ended." (*People v. Saling* (1972) 7 Cal.3d 844, 852.) A conspiracy does not necessarily end merely because it is not carried out as originally planned. (See *People v. Patrick* (1981) 126 Cal.App.3d 952, 966 [kidnapping conspiracy was not defeated when police arrived; conspirators avoided defeat by pretending to abandon it, but resuming plan later].)

Here, the jury could conclude the conspiracy continued even though either Besa or Benetti told Vigel that McDaniel was not there and McDaniel had in fact left. McDaniel's absence did not necessarily defeat the conspiracy; it may have only

38

postponed or prolonged it. Vigel and Bassett could have intended to pursue McDaniel after Vigel "shot up the place." Unfortunately for their victims, Vigel and Bassett did not abandon their criminal plans upon hearing that McDaniel was not there.

X

*Reduction to Second Degree Murder under* People v. Chiu

In a second supplemental brief, Bassett contends her first degree murder conviction must be reduced to second degree and the special circumstance vacated. In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), our Supreme Court held, as a matter of law, that an aider and abettor cannot be held culpable for first degree murder based on the natural and probable consequences doctrine. Here, the jury was instructed that Bassett could be guilty of first degree murder because she conspired with Vigel to assault McDaniel and murder was the natural and probable consequence of that conspiracy. Bassett contends that conspiracy is similar to aiding and abetting as a theory of vicarious liability, so the rule of *Chiu* applies. Since the jury was given the option of finding guilt based on the natural and probable consequence of a conspiracy, Bassett contends that she can be guilty only of second degree murder. We disagree.

A. *The Law*

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 161.)

"In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably

39

result in an unlawful killing.  A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder.  [Citation.]"  (*Chiu, supra*, 59 Cal.4th at p. 165.)  "[T]his same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder" because the required mental state of willfulness, premeditation, and deliberation is uniquely subjective and personal.  (*Id*. at p. 166.)  "Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine.  We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine."  (*Ibid*.)

"Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles.  [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]"  (*Chiu, supra*, 59 Cal.4th at pp. 166-167.)

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground.  [Citations.]  Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory . . . ."  (*Chiu, supra*, 59 Cal.4th at p. 167.)

40

B. *Analysis*

In *Chiu*, the record showed the jury was deadlocked between first and second degree murder and one juror had difficulty placing the defendant in the shoes of the actual shooter. "These events indicate that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting and that the holdout juror prevented a unanimous verdict on first degree premeditated murder based on that theory. Thus, we cannot conclude beyond a reasonable doubt that the jury ultimately based its first degree murder verdict on a different theory, i.e., the legally valid theory that defendant directly aided and abetted the murder." (*Chiu, supra,* 59 Cal.4th at p. 168.)

Here, as we explain, the record shows the jury based its first degree murder verdict on a legally valid ground; the jury found Bassett aided and abetted first degree drive-by shooting. Therefore, any error in the instructions is harmless beyond a reasonable doubt in this case.[9]

The People offered two theories of first degree murder: premeditation and deliberation and shooting a firearm from a motor vehicle. A drive-by shooting is first degree murder where it is "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death." (§ 189.) The People argued Bassett could be guilty of first degree murder either as an aider and abettor or, under the natural and probable consequence doctrine, of an uncharged conspiracy to assault McDaniel. The jury was instructed on the natural and probable consequences doctrine as it related to a conspiracy.

---

[9] Because any error is harmless, we need not address whether *Chiu* limits a murder conviction to second degree when the natural and probable consequence doctrine applies to a conspiracy rather than aiding and abetting. (See *People v. Rivera* (Mar. 9, 2015, C074297) ___ Cal.App.4th ___.)

The jury found Bassett guilty of first degree murder of Freeseha.  The jury also found the drive-by shooting special circumstance true.  Specifically, the jury found the murder "was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside the vehicle with the intent to inflict death."  This finding establishes beyond a reasonable doubt that the jury found Bassett guilty as an aider and abettor of first degree drive-by murder.  Bassett's first degree murder conviction was based on a legally valid theory.

XI

*Prosecutorial Misconduct:  Misstating the Law of Intent*

Bassett contends the prosecutor committed misconduct by misstating the law of intent in telling the jury that Bassett could be guilty of attempted murder if she intended to kill McDaniel.  She contends that because the information charged attempted murder on the basis that Bassett intended to kill certain named victims, basing attempted murder on her intent to kill McDaniel denied her notice and a reasonable opportunity to defend.

A.  *Background*

In arguing that Bassett was guilty of attempted murder as an aider and abettor, the People argued:  "That intent to kill element is still there.  We've talked about that in length.  Don't have to prove that her intent to kill was as to these three specific victims or the fourth, Mr. Benetti.  [¶]  Don't have to prove that it was her specific intent to kill either one of them.  Could have been specific intent to [kill] Brian McDaniel.  [¶]  You have evidence of both.  Her anger directed towards him and then really everyone else at [the] party as she's getting in the car."

Bassett objected, stating:  "That misstates the law on aiding and abetting."  The objection was overruled.

The People's argument continued, stating the law was defined in CALCRIM No. 601 [premeditated attempted murder].  The People then addressed the kill zone theory.

42

B. *The Law*

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)

It is prosecutorial misconduct to misstate the applicable law during argument to the jury. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21; *People v. Otero* (2012) 210 Cal.App.4th 865, 870.)

In considering whether a defendant was harmed by the misconduct, we examine the prosecutor's remarks in the context of the whole record, including arguments and instructions. (*Morales, supra,* 25 Cal.4th at p. 44.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717; *People v. Boyette* (2002) 29 Cal.4th 381, 436 [even if prosecutor misstated the law, "the trial court properly instructed the jury on the law, and we presume the jury followed those instructions"].)

43

C. *Analysis*

Because proving Bassett's intent to kill McDaniel was insufficient to prove attempted murder as to the three charged victims, the People were wrong to argue otherwise, as was the trial court to overrule the objection. However, we find the error harmless. The improper argument constitutes less than half a page of an argument consuming over 60 pages of transcript. Elsewhere, the People correctly argued the law of intent to kill and aiding and abetting. Bassett does not challenge that argument. More importantly, the trial court correctly instructed the jury on the applicable law. Directly after the portion of the argument referenced above, the People referred the jury to the instructions. The court directed the jury that if argument conflicted with the instructions, the jury was to follow the instructions. Bassett has not shown--and we do not find--"a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*Morales, supra,* 25 Cal.4th at p. 44.)

XII

*Juror Misconduct: Elk Grove Calls*

Vigel contends the verdicts were tainted by outside information that one of the jurors received. Juror No. 7 told the other jurors that she had received "strange" phone calls from Elk Grove, the city where the shootings occurred. Vigel contends this outside information "tainted the verdicts" and the presumption of prejudice was not rebutted. Bassett joins this contention.

A. *Background*

The afternoon before the jury in the second trial reached a verdict, the jury sent the trial court a note. The note listed a phone number and then said: "Juror #7 mentioned that she has been receiving strange phone calls from the above phone number. Her phone says this phone number is in Elk Grove. We thought it prudent to mention this."

The next morning, after the jury indicated it had reached a verdict, counsel for Bassett requested that the court ask Juror No. 7 whether these calls influenced her

44

decision-making process and that this inquiry occur before the verdict was read. Juror No. 7 told the court that she received these calls about twice a week from the beginning of the trial, a total of 10 calls. She never spoke to anyone or received a message. She declared that her vote on the verdict was not influenced by these calls. She had told the other jurors about these calls, both the number of them and that they were from Elk Grove. The bailiff reported that she had not heard about the calls until she was handed the note. Upon further questioning, Juror No. 7 indicated she mentioned the calls to the other jurors only late the previous afternoon. She did not report the calls earlier because at first she thought it was just a wrong number, and she still thought it could be. The court then questioned each juror individually about whether the information about the calls influenced his or her verdict and each juror said no.

Bassett then moved for a mistrial based on Juror No. 7 violating the court's admonitions. Vigel joined the motion.

The trial court clarified that its admonition to the jury was to tell the bailiff only if someone tried to contact them about this case; it was not to report anything a juror thought could be relevant. The court found it crucial that the juror received no actual communication and found that Juror No. 7 did nothing wrong. It denied the motion for a mistrial.

B. *The Law*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).) "A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice." (*Id*. at pp. 294-295.) When the alleged misconduct involves an unauthorized communication with a juror, the presumption of prejudice does not arise unless there is a

45

showing that the content of the communication was about the guilt or innocence of the defendant.  (*Id.* at p. 305.)

"Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice.  [Citations.]" (*Hamilton, supra,* 20 Cal.4th at p. 295.)  The test for whether an individual verdict must be overturned for jury misconduct or irregularity is an objective standard:  the substantial likelihood test.  (*Id.* at p. 296.)  "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.  [Citations.]" (*Ibid*.)

"A sitting juror commits misconduct by violating her oath, or by failing to follow the instructions and admonitions given by the trial court.  A lay juror cannot be expected to conform to standards of behavior of which she has not been informed, or to make unguided personal judgments about what the court needs to know.  Her failure to do so cannot place at risk a presumptively valid verdict." (*Hamilton, supra,* 20 Cal.4th at p. 305.)

C. *Analysis*

Here, no presumption of prejudice arose from the calls to Juror No. 7.  The only evidence that the calls were somehow related to this case was their regular occurrence throughout the trial and their origination in Elk Grove.  Significantly, nothing was said and no message was left.  Although defendants speculate that "a reasonable juror" could infer that someone in Elk Grove "wanted a guilty verdict," an inference to the contrary--that someone wanted an acquittal--is just as likely.  And neither of these inferences is reasonable given the complete lack of communication within the calls.

The ambiguous nature of the calls is analogous to the juror situation in *Hamilton*. There, in a habeas proceeding claiming jury misconduct in a capital case, a juror

declaration indicated that once during the guilt phase of the trial, petitioner's sister and her boyfriend parked in an alley behind the juror's home, they sped away when they saw the juror, and the juror did not report the incident to the police. (*Hamilton, supra,* 20 Cal.4th at p. 304.) There was doubt as to whether this incident actually occurred. (*Ibid.*, see also fn. 24.) Our Supreme Court found no misconduct in failing to report this incident to the trial court because the incident did not fall within the admonitions given; the jury was told to avoid any contact with those connected to the case, not to report a mere observation of such persons. (*Id.* at p. 305.) Second, there was no communication involved. (*Id.* at p. 306.) Finally, even if the incident was interpreted as an improper attempt to intimidate the juror, the objective circumstances--that the episode was brief, isolated, and ambiguous--gave rise to "no substantial likelihood" that the incident resulted in actual bias. (*Ibid.*)

We recognize there are differences between this case and *Hamilton*. Here, the calls were not isolated; they continued throughout trial. Further, unlike the juror in *Hamilton*, Juror No. 7 discussed the matter with other jurors. On the other hand, however, in *Hamilton* it was certain that the incident involved parties related to the petitioner. Here, the source of the calls as well as the reason for them is unknown--even their recipient opined that the calls could be meant for another number. Moreover, to the extent the presumption of prejudice did arise, it was rebutted. The trial court questioned each juror about the effect this information had on his or her decision. Without equivocation, each juror said it had none. Defendants provide no reason why we should not accept the trial court's credibility determination on this issue. (See *In re Carpenter* (1995) 9 Cal.4th 634, 646 [appellate court accepts trial court's credibility determinations on juror misconduct].)

47

XIII

*Juror Misconduct:  Inattentive Juror*

Bassett contends the trial court violated her right to due process by failing to conduct an adequate hearing into possible misconduct by Juror No. 3.  There was evidence that this juror had been inattentive during trial and that she told another juror she did not know what was going on in the trial.  Bassett contends the trial court erred in failing to (1) question the second juror about her conversation with Juror No. 3; (2) question those who claimed to have seen Juror No. 3 asleep during trial; and (3) ask Juror No. 3 about her lack of attentiveness and her comments about the same.  Vigel joins this contention.

A.  *Background*

On the first full day of deliberations in the second trial (a Monday), Juror No. 3 told the bailiff that she needed the next day off to take her daughter on a field trip; she had mentioned the trip during voir dire and had been told it would not be a problem.  The court conferred with the lawyers to determine the appropriate course of action:  whether to tell the juror that she had to be at trial, to give the rest of the jurors the day off as well, or to remove the juror and replace her with an alternate juror.

Bassett moved to remove Juror No. 3 and Vigel joined the motion.  Vigel's attorney noted Juror No. 3 had appeared inattentive during trial, often closing her eyes.  The court responded that if counsel wanted this juror removed for sleeping or being inattentive, they should have made a motion at the time of the observation.  Bassett's attorney then recounted information he had learned from Bassett's mother, Lisa Boyce.  Boyce told him that on Thursday an Asian female juror left the courtroom, extremely upset and said the case was taking too long.  On Friday, this juror asked the bailiff if an alternate could be substituted.  On this Monday, Boyce said she had a conversation with an African-American woman outside (later identified as Sharika Johnson).  Boyce was on her cell phone, mentioning that the jury was deliberating in her daughter's case.  Johnson

48

said, "that's weird" because she had heard an Asian woman wearing a juror badge comment she did not know what was going on because she was not paying attention during trial. The bailiff reported to the court that Juror No. 3 had never asked for an alternate. The court then questioned the accuracy of Boyce's information.

The People objected to removing Juror No. 3, claiming there was not good cause. The court agreed there was no good cause. It found the information from Johnson too tenuous to conduct an investigation.[10] The court gave the jury the following day off.

Bassett's counsel then spoke with Johnson and learned that she had seen Juror No. 3 talking with Juror No. 9. Juror No. 3 walked by the courtroom and threw up her hand in the direction of the courtroom, saying, "I don't know what they were -- were even talking about. I wasn't paying attention." Counsel asked that Juror No. 3 be brought in "just to ask [the] general question about whether she's discussed outside the jury room anything -- made any comments outside the jury room relating to our case." Vigel's counsel added that Juror No. 3 had her eyes closed frequently, consistent with someone not paying attention. The court indicated it had watched Juror No. 3 throughout the trial and early on she appeared to nod off. The court had the bailiff give her a cup of water. The court said it was careful to make sure Juror No. 3 was not falling asleep. The court declined to question the juror about her inattentiveness since it had not been raised earlier. Bassett's attorney then said Boyce had told him that she thought Juror No. 3 was sleeping. Boyce's brother made the same comment.

The trial court called Juror No. 3 in and told her it had been reported she had made a comment in the hallway that could be interpreted as a comment about the case. The court reminded her of the admonition not to discuss the case outside the presence of all the other jurors and asked if she had abided by that admonition. Juror No. 3 said yes.

---

[10] The court questioned its authority to question "some civilian out in the hallway."

B. *The Law*

The trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . ." (§ 1089.) While extreme inattentiveness due to sleeping may constitute good cause to discharge a juror, " 'courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. . . . Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. [Citations.]' [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1349 (*Bradford*).) "A juror must not be discharged for sleeping unless there is convincing proof the juror actually slept during trial. [Citations.]" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 731.)

"Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) The decision whether to investigate the possibility of juror misconduct rests within the sound discretion of the trial court. (*People v. Ray* (1996) 13 Cal.4th 313, 343.) "The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*Ibid*.) Mere speculation that a juror might have been sleeping or inattentive is insufficient to provide notice of good cause to discharge, and does not obligate a trial court to conduct an inquiry. (*Espinoza*, at p. 821.)

C. *Analysis*

The alleged inattentiveness of Juror No. 3 was insufficient to require the trial court to conduct an inquiry. The court itself had paid attention to this particular juror after early signs of sleepiness. The court did not observe her actually sleeping. The court could reasonably conclude that Boyce's information, coming at the 11th hour and from

50

an interested party, was unreliable, especially after her earlier information that Juror No. 3 had spoken to the bailiff about being replaced proved unreliable. Although counsel claimed he observed inattentiveness, and had been told the same by Boyce and her brother, his failure to make a concomitant assertion of juror misconduct indicates an inquiry was not required. (*Bradford, supra,* 15 Cal.4th at p. 1349.)

Bassett faults the court for making only a limited inquiry of Juror No. 3, suggesting additional questions that should have been asked and additional people who should have been questioned. The trial court's inquiry tracked the question suggested by Bassett's counsel. When the court asked if there should be a further investigation based on the statement from Johnson as to what Juror No. 3 said, counsel expressed concern about "tainting her in any fashion." Having both suggested and agreed to the limited inquiry, Bassett cannot now object that it was too limited. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [where defendant both suggested and consented to court's responses to jury question, the claim of error forfeited].)

XIV

*Sentence on Gang Enhancement*

Vigel contends the trial court erred in imposing a sentence of 15 years to life for the gang enhancement on count one, the murder charge.[11] He contends the proper sentence for a section 186.22, subdivision (b) gang enhancement where defendant

---

[11] For the first time at oral argument, Vigel contended the section 186.22, subdivision (b) gang enhancement did not apply to a life term without the possibility of parole, relying on *People v. Lopez* (2005) 34 Cal.4th 1002. This argument is procedurally barred because points first raised at oral argument are untimely and need not be considered. (*California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1500.) In *Lopez,* our Supreme Court noted "the predecessor to section 186.22(b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Lopez,* at p. 1010.) We recognize, of course, that the gang enhancement has no practical effect on a defendant sentenced to life without the possibility of parole.

received a life sentence is a minimum parole eligibility of 15 years.  The People respond this minimum parole eligibility term is properly expressed as an additional sentence of 15 years to life, relying on *People v. Villegas* (2001) 92 Cal.App.4th 1217 (*Villegas*).

Section 186.22, subdivision (b) provides in relevant part:  "[A]ny person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."  Vigel was sentenced to a life sentence without the possibility of parole, so this provision for minimum parole eligibility has no practical effect on him.  It is subsumed by the sentence of life without the possibility of parole.  As our Supreme Court has noted, "newer and more powerful sentencing laws, such as section 190, have sapped the strength of section 186.22(b)(5)."  (*People v. Montes* (2003) 31 Cal.4th 350, 361, fn. 14.)

Unsurprisingly, the abstract of judgment form has no provision for showing a minimum parole eligibility date where the sentence does not provide for parole.  In sentencing Vigel on the gang enhancement attached to count one, the murder charge, the trial court relied on *Villegas, supra,* 92 Cal.App.4th 1217.  In *Villegas*, the trial court imposed a 15-year-to-life sentence for the gang enhancement allegation under section 186.22, subdivision (b) where defendant received a life sentence for attempted premeditated and deliberate murder.  The appellate court found no error, finding the sentence correctly set a minimum parole eligibility of 15 years.  (*Villegas,* at pp. 1228-1229.)

Without directly addressing *Villegas*, Vigel contends this approach is incorrect and the 15-year-to-life sentence must be stricken.  Vigel offers no reason--persuasive or otherwise--why the trial court erred in following *Villegas.* He does not explain how a statement of 15-year minimum parole eligibility functions differently from a 15-year-to-life term so as to make the sentence unauthorized.  Nor does he explain how changing the abstract as he seeks will benefit him.  Accordingly, Vigel has failed to show error.

52

Vigel contends the abstract must be corrected to show the proper sentence on counts 2, 3, and 4, the attempted murder charges. For these counts, the abstract does provide a method for showing a minimum parole eligibility term. Vigel contends that the minimum parole eligibility of 15 years should be shown by checking box 6.a. (life with the possibility of parole on counts 2, 3, & 4, with a minimum parole eligibility of 15 years to life) rather than showing a 15-year to life enhancement on these counts under box 2 (enhancements). He further contends that box 7 (additional determinate term--see CR-290.1) should not be checked because no form CR-290.1 was prepared. The People agree to these corrections. Because all parties agree, we will direct the changes be made.

XV

*Jury Determination of Restitution Fine*

Defendants contend they had a right to a jury trial with regard to the restitution fines. As to both defendants, the court imposed a $10,000 restitution fine under section 1202.4, and ordered direct victim restitution in the amount of $28,251.19. Bassett contends these restitution fines are punishment and a victim restitution fine "could not [be] imposed on judicially determined facts without violating the Sixth Amendment," citing *Southern Union Co. v. United States* (2012) 567 U.S. ___ [183 L.Ed.2d 318] (*Southern Union*) and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*)). Vigel joins in this argument.

In *Apprendi*, *supra*, 530 U.S. at page 490 [147 L.Ed.2d at p. 455], the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." "[The] 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (*Blakely v. Washington* (2004) 542 U.S. 296, 303 [159 L.Ed.2d 403, 413].) "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may

53

impose after finding additional facts, but the maximum he may impose *without* any additional findings." (*Id.* at pp. 303-304, [159 L.Ed.2d at pp. 413-414].) In *Southern Union, supra,* 567 U.S. at p.___ [183 L.Ed.2d at p. 334], the United States Supreme Court held *Apprendi* applies to the imposition of criminal fines. The statutory fine imposed in *Southern Union* was $50,000 for each day of violation of a federal environmental statute and the trial court, not the jury, made a specific finding as to the number of days the statute was violated. The United States Supreme Court held the district court's factual finding as to the number of days the defendant committed the crime violated *Apprendi*. (*Southern Union, supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 329].)

In *People v. Kramis* (2012) 209 Cal.App.4th 346 (*Kramis*), the Second District, Division Five held that *Apprendi* and *Southern Union* do not apply when the trial court exercises its discretion within a statutory range, as it does when selecting a restitution fine pursuant to section 1202.4, subdivision (b). The court explained that " '*Apprendi* distinguishes a "sentencing factor"—a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense"—from a "sentence enhancement"—"the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence." [Citation.]' [Citation.]" (*Kramis,* at p. 351, citing *People v. Urbano* (2005) 128 Cal.App.4th 396, 405-406.) Because the $10,000 restitution fine was within the statutory range of section 1204.4, subdivision (b), "*Apprendi* and its progeny do not preclude its imposition." (*Kramis,* at p. 352.)

In *People v. Pangan* (2013) 213 Cal.App.4th 574, the Fourth District, Division Three held that neither *Apprendi* nor *Southern Union* applied to direct victim restitution. The court reasoned that "direct victim restitution is not a criminal penalty. As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a

substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment.' [*People v. Millard* (2009) 175 Cal.App.4th 7, 35] makes the same point in regard to California law. [Citations.] [*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184] has collected the numerous federal cases also holding victim restitution does not constitute increased punishment for crime. [Citation.] And we would note the restitution statute *itself* characterizes victim restitution awards as civil. (See [] § 1202.4, subd. (a)(3)(B) [victim restitution 'shall be enforceable as if the order were a civil judgment'].)" (*Pangan,* at p. 585.)

We agree with the reasoning of the courts in *Kramis* and *Pangan.* Here, as in *Kramis*, defendants were not entitled to a jury trial on the fines imposed pursuant to section 1202.4, subdivision (b) because these fines were within the range prescribed by statute. Further, as in *Pagan*, they were not entitled to a jury trial on the $28,251.19 award to the state victims' restitution fund because direct victim restitution is not increased punishment.

## XVI

### *Parole Revocation Fine*

Bassett and the People agree that the trial court erred by imposing a parole revocation fine where there is no parole eligibility.

Section 1202.45 provided for a fine equal to the restitution fine under section 1202.4 "[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole." (§ 1202.45, as amended by Stats. 2007, ch. 302, § 15.) The parole revocation fine may not be imposed where defendant is sentenced to life in prison without parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63.) Here, it was. We shall strike the fine.

Although the trial court did not orally impose a parole revocation fine on Vigel, his abstract also shows a $10,000 parole revocation fine. We direct that the trial court correct his abstract to delete this fine.

55

## XVII

### *Fines and Fees*

Vigel contends there are additional errors in the abstract of judgment relating to fines and fees. Bassett does not join in this contention.

First, he contends the order for restitution in the amount of $28,251.19, pursuant to section 1202.4, subdivision (f), should be shown as joint and several. Vigel failed to object to the restitution order and therefore has forfeited the issue on appeal. (*People v. Tillman* (2000) 22 Cal.4th 300, 303.) Further, the decision to make restitution joint and several is a discretionary sentencing choice. (See *People v. Neely* (2009) 176 Cal.App.4th 787, 800.) Here, the trial court did not order this restitution to be a joint and several obligation.

Second, the People agree the amount of Vigel's court security fee ($120) is incorrect. Judge Fall imposed a fee of $120 on counts 1, 2, and 5. Judge Sawtelle imposed an additional fee of $80 on counts 3 and 4. The abstract should reflect $200 as the court security fee.

Third, Vigel contends the court facility fee assessment is not shown on the abstract, and the People agree. Judge Fall imposed $90 for counts 1, 2, and 5. Judge Sawtelle imposed a fee of $60 for counts 3 and 4. The abstract should reflect $150 as the court facilities fee.

## XVIII

### *Cumulative Error*

Bassett contends the cumulative effect of the many errors deprived her of a fair trial. Having rejected all claims of trial error, we find no cumulative error. (*People v. Watkins* (2012) 55 Cal.4th 999, 1036; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1369.)

**DISPOSITION**

The parole revocation fine imposed on Bassett is stricken. The trial court is directed to correct that portion of Vigel's abstract of judgment concerning the sentence on counts 2, 3, and 4, the parole revocation fine, and other fees in accordance with this opinion and to prepare an amended abstract of judgment as to Bassett, and a corrected abstract of judgment as to Vigel, and to forward certified copies to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

           DUARTE         , J.

We concur:

     MURRAY      , Acting P. J.

     HOCH        , J.